THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:07-HC-2097-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | **PETITIONER'S PROPOSED FINDINGS OF** |
| v. | ) | **FACT AND CONCLUSIONS OF LAW** |
| | ) | |
| HOBART BARRETT, | ) | |
| | ) | |
| Respondent. | ) | |

## INTRODUCTION

Petitioner, the United States, seeks to civilly commit Respondent, Hobart Barrett, as a "sexually dangerous person" under Section 302(4) of the Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act"), Pub. L. No. 109-248, Title 111, § 302(4), 120 Stat. 587, 620-22 (2006), codified at 18 U.S.C. §§ 4247-4248. Petitioner must prove by clear and convincing evidence that Respondent is "sexually dangerous." A person is sexually dangerous if he "has engaged or attempted to engage in sexually violent conduct or child molestation and . . . is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). To determine that a person is sexually dangerous to others, a court must find that he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." Id. § 4247(a)(6). Petitioner proposes the following findings or fact and conclusions of law:

## FINDINGS OF FACT

### A.  Procedural History

**1.**    On May 18, 2007, Petitioner certified Respondent pursuant to 18 U.S.C. § 4248. (See D.E. #1.)   On September 11, 2007, Respondent filed a motion to dismiss the certification relying on this Court's holding in United States v. Comstock, 5:06-HC-02195-BR, entered on September 7, 2007. (See D.E. #8.)   On January 8, 2008, sua sponte the Court stayed the proceedings pending resolution of the appellate process in Comstock. (See D.E. #16.)   At no time did the United States request a stay of the proceedings.[1]

**2.**    On June 11, 2010, the stay was lifted. (See D.E. #20.)   On November 3, 2010, for the first time, Respondent requested a commitment hearing. (See D.E. #28.)   On September 16, 2011, this Court set the hearing for November 30, 2011. (See D.E. #77.)

**3.**    The Court entered a Final Joint Pre-Trial Order on November 23, 2011. (See D.E. #89.)   Petitioner has identified fifty-one exhibits for admission, and four witnesses it may call during its case-in-chief: 1) Dr. Harry Hoberman, 2) Dr. Lela Demby, 3) Dr. Logan Graddy, and 4) Respondent.   Respondent has identified three exhibits for admission, and four witnesses he may call during his case-in-chief: 1) Dr. Terence Campbell, 2) Respondent, 3) Teresa

---

[1] When Respondent requested release, the United States requested a stay of the release pending appellate petitions.

Hendon, and 4) Michael Riddick.

**B.    Personal and Family Data[2]**

1.    Hobart Barrett was born in 1947 in Austin, Indiana, the second of twelve children.  Respondent reported that he changed his name to Robert Barrett during one of his incarcerations in Terre Haute, Indiana. Respondent also used at least one other alias, Courtley Stepp, during his adult life.

2.    Respondent described his parents as uneducated, country people who did not know how to discipline their children. Respondent stated that his mother was an alcoholic, and that his father was an alcoholic until the late 1970's when he quit drinking after being diagnosed with cirrhosis of the liver.  Respondent stated that his father verbally and physically abused his mother and emotionally abused Respondent. Respondent stated that he was raised in a very chaotic environment and that the family moved back and forth between Ohio and Kentucky often.  Respondent stated that his father worked regularly in the coal mines, but the family never had anything due to his father's alcoholism. Respondent indicated that the family lacked structure or rules, and that no family member was actually

---

[2] The information in Sections B-D is taken primarily from Government Exhibits 8, 9, 13, 19, 22, 23, 27, 28, 31, 40, 49, and 50 and the various expert reports of Dr. Hoberman, Dr. Demby, and Dr. Graddy in Government Exhibits 1, 3, 4, and 6.  All four testifying experts relied on this information in forming their opinions and preparing their reports.

in charge of the household.

3.     Respondent stated that his parents are deceased, and he has little contact with his siblings.

4.     Respondent has alternately denied that he was sexually abused as a child and conversely claimed that he was sexually abused at the age of 5 by a male relative.

5.     Respondent stated that he was stealing bicycles by his adolescence. Respondent stated that he was arrested at age 14 for breaking and entering. Respondent stated that he was truant from school, and dropped out of high school in the 9th grade, although he eventually earned his GED while incarcerated.

6.     Respondent has been married twice. He married his first wife in October 1967 and divorced her in 1968.  One son was born from this marriage, but Respondent reported that he has never even seen this child.  Respondent married his second wife, who was 16 years younger than him, in 1982 and divorced her about two years later. One daughter was born from this marriage, but Ohio's social services removed this child from the home when she was one year old. Respondent has had no further contact with his daughter.

7.     Respondent stated that he began drinking alcohol at age 10.  Respondent has described himself as an alcoholic, and acknowledged that he could not control himself when drinking.  He has further stated that most of his problems, including his arrests,

stemmed from his consumption of alcohol. He reported that he has attended Alcoholics Anonymous meetings sporadically. Respondent has been arrested on several occasions for crimes related to using alcohol while operating a car. Respondent has alternately denied any other substance use or abuse and conversely admitted to occasional use of marijuana, experimentation with cocaine, and using LSD on three occasions. Respondent completed the Residential Drug Abuse Program in 1996 and the Non-Residential Drug Abuse Program in June 2007 while incarcerated in the BOP system.

8. Respondent has spent over 42 of the past 48 years, since he was 16 years old either incarcerated or in some other form of official custody. While in the community, he claims to have worked as a self-employed landscaper, but his employment history cannot be independently verified. In any event, Respondent has a very limited employment record.

## C. Respondent's Criminal History

1. On July 13, 1963, Respondent was arrested for Stabbing with Intent to Kill or Wound a juvenile female victim and sent to Ohio State Reformatory for three years. On July 28, 1966, Respondent was paroled from Ohio State Reformatory.

2. On September 1, 1966, —a little over one month later— Respondent was arrested in St. Louis, Missouri for violating his parole and returned to Ohio State Reformatory for another year. On

5

August 15, 1967, Respondent was released from Ohio State Reformatory.

**3.** On December 12, 1967, —a little less than four months later— Respondent was arrested and charged with two counts of Assault with Intent to Rape for his protracted, brutal, humiliating sexual assault that he and his 15 year old brother perpetrated on two 14 year old girls. Respondent and his brother drove up to two 14 year old girls and a 13 year old boy standing on a street corner. They forced the three youths into the car, drove a short distance, and then forced the 13 year old boy out of the car. Respondent's brother then took one girl into a heavily weeded area and attempted to rape her. Respondent remained in the car with the second girl and tried to force her to perform fellatio on him. When she refused, he choked her. He let her out of the car to urinate, and she ran into the woods and found help at a nearby residence. Respondent drove away with his brother and the first girl. They drove to another location and continued to assault her. Respondent attempted to force the girl to perform fellatio on him, and beat her on the face and breasts. They returned to the car and made the girl sit between them while nude. While driving Respondent continued to force her to perform fellatio on him. He drove to a third location where Respondent took the girl to a wooded area and attempted to vaginally rape her. When that failed, he drove away, leaving the 14 year old girl in an unfamiliar wooded area, nude. On May 22, 1968, Respondent pleaded guilty to

6

Assault to Rape in Hamilton County OH Criminal Case No. 90743. On July 30, 1968, Respondent was sentenced to Lima State Hospital as a psychopathic offender in Hamilton County OH Criminal Case No. 90743. On April 7, 1970, Respondent was ordered to leave Lima State Hospital and begin his incarceration in Ohio state prison.

4. On February 25, 1973, Respondent escaped from Ohio state prison, burglarized a house by stealing money, guns, food, clothing, a radio, and a car. He was arrested the next day. On March 1, 1973, Respondent was convicted of transporting a stolen car across state lines in violation of the Dyer Act in federal court and was in federal custody as a result of this crime from March 1, 1973 until July 1, 1976. On Nov. 13, 1973, Respondent was convicted of breaking & entering an inhabited building in the day in Warren City, Ohio case # 10073 related to his escape and burglary. On July 1, 1976, Respondent was released from federal prison and returned to Ohio state prison to serve his Ohio sentence related to the 1968 rape case and the 1973 burglary until his release to parole. On November 13, 1978, Respondent was released from Ohio state prison to parole.

5. On February 26, 1979, —about three and a half months later— Respondent and his brother allegedly robbed and abducted a female gas station attendant in Erlanger, Kentucky. On March 4, 1979, Respondent was arrested in Cincinnati, Ohio for the alleged robbery and abduction, and found to possess counterfeit $20 dollar bills.

On October 30, 1979, Respondent was convicted in federal court of possessing counterfeit money and sentenced to imprisonment. On February 2, 1982, Respondent was paroled from federal imprisonment and sent to a halfway house for probation.

**6.** On March 22, 1984, Respondent was convicted of a DUI.

**7.** On August 10, 1984, Respondent was taken back into federal custody after two DUIs and a Disorderly Conduct conviction, failure to submit truthful supervision reports, excessive use of alcohol and a violation of the special condition for Alcohol Aftercare. In 1986, he was paroled to a halfway house. During his 30-day stay at the halfway house, he received five disciplinary reports, one warning report, and two incident reports. He was returned to FCI Milan until his parole date. On April 16, 1987, Respondent was paroled from federal imprisonment.

**8.** On June 5, 1988, Respondent was taken into federal custody after Failure to Report an Arrest, Driving Left of center and Excessive Use of Alcohol and a violation of the special condition to participate in Alcohol Aftercare. On March 7, 1989, Respondent was placed at a halfway house in Lexington, Kentucky, as part of his final release status.

**9.** On July 8, 1989, —about three months later— Respondent allegedly attempted to rape his 13 year old niece. His 13 year old niece stated that when she and Respondent were alone in a car,

Respondent told her that he was going to do something sexual to her and then kill her and throw her body in the river so that no one would ever find her. At that point, she said that they struggled, and luckily, she was able to escape from the car and hide until Respondent got tired of looking for her and left. On November 22, 1989, Respondent pleaded guilty to unlawful imprisonment of his 13 year old niece and was sentenced to a year in Kentucky state prison. On April 9, 1990, Respondent was released from Kentucky Department of Corrections.

    10. On July 17, 1990, —a little more than three months later— Respondent was staying at a hotel in Chesapeake, Ohio under the alias Courtley Stepp. Respondent kidnapped a 5 year old girl from the hotel where he was staying and she was living with her parents. He drove her several states away and molested her. On July 18, 1990, Respondent abandoned the 5 year old girl he molested in Winston-Salem, North Carolina —about 270 miles away. She was left completely alone, under an underpass on a busy highway for several hours before she was rescued. The 5 year old girl was taken to a hospital where it was discovered that she had suffered vaginal lacerations and bruising around her anus. It was noted in the Pre-Sentence Report that the victim suffered from post traumatic stress disorder and that the victim's family had originally sought treatment but had to discontinue it because they could not afford

it.  Respondent escaped after he abandoned this 5 year old little girl that he molested and was not caught for several months.

**11.**  On October 24, 1990, Respondent was arrested by the Indiana State Police in Versailles, Indiana.  Respondent was living with a woman and her two young daughters aged 3 and 4 (or 2 and 5, depending on different reports) when he was arrested.

**12.**  On November 15, 1991, Respondent was sentenced to life in prison after he pleaded guilty to kidnapping the 5 year old girl in case #CR-1-90-085 from the Southern District of Ohio. Unfortunately, the Sixth Circuit vacated the original sentence which eventually led to Respondent's release and subsequent attempts to molest more children.  On March 22, 1993, Respondent was re-sentenced to 170 months in prison.  On March 21, 2003, Respondent was released to his five year term of supervised release.

**13.**  On November 2, 2003, —a little more than seven months later— Respondent allegedly sexually molested and attempted to rape a 9 year old girl and a 6 year old girl who were the daughters of his nephew's girlfriend.  On that day, Respondent's nephew, the nephew's girlfriend, and her two daughters stayed at Respondent's apartment. At approximately 2 a.m., Respondent approached the 9 year old girl and asked her to lie with him in his kitchen where he had made a bed on the floor.  The 9 year old girl lay on the floor with Respondent who then asked her to remove her clothes.  She refused

10

so he offered her gifts and said he would take her to an amusement park. Respondent then began kissing her on the neck and put his hand on her pubic area outside of her clothing.  She got scared and went to Respondent's nephew.  Respondent then attempted to get the 6 year old girl to lay with him on the kitchen floor.  He offered her a doll, but she rebuffed him and went to her mother.

**14.**  On November 24, 2003, Respondent was arrested for violations of his terms of supervised release.  At the time of his arrest, the U.S. Marshals found Respondent in the company of a prostitute who possessed crack cocaine.  No formal charges were filed for Respondent's sexual assault of the two young girls.  However, on December 11, 2003, the District Court in the Eastern District of Kentucky revoked Respondent's supervised release for two separate violations of possessing a dangerous weapon (a switchblade knife) and possessing pornography.  When sentencing Respondent for these two violations, the court considered the allegations of sexual abuse to be credible and, in reliance upon them, sentenced Respondent to 48 months.  Respondent's sentence was about twice as long as it otherwise would have been absent those credible allegations of sexual assault.  Respondent has been in federal custody since his supervised release was revoked in 2003 because Petitioner certified Respondent under the Adam Walsh Act Prior to his release in 2007.

**D. Respondent's Mental and Emotional Health**

**1.** Respondent reported a history of three inpatient psychiatric hospitalizations. The first occurred in 1968, following his arrest for and conviction of Assault with Intent to Rape. He received a psychiatric evaluation at Lima State Hospital and was committed indefinitely until 1970. In the Psychiatric Evaluation Report from Lima State Hospital dated June 26, 1968, Respondent was diagnosed with Antisocial Reaction. The report also stated that Respondent obtained an IQ score of 80, which placed him in the borderline range of intellectual functioning. The report noted that Respondent had some impulsive reactions and tension.

**2.** According to a Pre-Parole Personality Evaluation dated May 1977, Respondent exhibited features that strongly suggested the existence of emotional instability and impulsive trends. This report also noted Respondent's difficulties with alcohol.

**3.** Respondent also reported two hospitalizations related to his mental health in 1984. The first of these occurred while the United States Marshals Service was looking for Respondent for a parole violation. Respondent had been staying with his sister, and was reported to be acting in a bizarre manner. He was placed in a psychiatric hospital for 15 days. He left the hospital but was returned one week later, after he held a gun, which contained one bullet, to his head and pulled the trigger four times. Respondent

12

stated that he had not wanted to kill himself, but "just flipped out."

**4.**   In early 1991, the District Court from the Southern District of Ohio sent Respondent to FCI Butner to be evaluated for competency to stand trial related to his 1990 kidnapping and molestation of a 5 year old girl.  In the March 26, 1991, Forensic Evaluation that was produced pursuant to that court's request, Dr. Backer and Dr. Owens found that Respondent could be held criminally responsible for his behaviors during the time period of the alleged offense.    They   also   diagnosed   Respondent   with   Antisocial Personality Disorder and alcohol dependence.

**5.**   In the March 10, 1993, Pre-Sentence Report prepared for Respondent's re-sentencing related to the 1990 kidnapping and molestation of a 5 year old girl, Respondent acknowledged to the U.S. Parole Officer that he had been psychiatrically evaluated on a number of occasions.   However, Respondent denied the validity of the diagnoses made on him in the past by explaining that he had faked his symptoms while at the Lima State Hospital and provided inaccurate and false information while undergoing an evaluation at Butner, North Carolina in 1990.   Respondent further stated that he had studied psychology   and   had   a   clear   understanding   of   himself.    He acknowledged that alcohol has caused him numerous problems but he did not believe that he needed any type of psychiatric treatment.

**6.** In 2000, while Respondent was serving his federal sentence for kidnapping and molesting the 5 year old girl, he volunteered to participate in the BOP Sex Offender Treatment Program ("SOTP") at FCI Butner. The Director of the SOTP reluctantly agreed to allow Respondent to participate in the SOTP. Respondent was transferred from FCI Manchester to FCI Butner in March 2001 to begin the SOTP. Respondent was expelled from the SOTP in May 2001. He was expelled based on the results of his psychological evaluation and participation in the assessment phase of the program when he was diagnosed with the serious, lifelong personality disorder of psychopathy for which psychological treatment was contraindicated.

**7.** At the time of his discharge from the SOTP, Respondent was diagnosed with Pedophilia, Sexually Attracted to Females, Nonexclusive Type and Antisocial Personality Disorder (with psychopathic features). Furthermore, the Director of the SOTP found that though Respondent claimed to be motivated for treatment, Respondent's behavior throughout the examination period suggested that his participation was not based on intrinsically-motivated reasons. Instead, it appeared that Respondent wanted to participate in the SOTP based on factors related to external gain such as the ability to live in a more comfortable residential unit because treatment units are known to be quieter and less stress-inducing than general population units.

14

**8.** Respondent has admitted that he has previously purposefully underperformed on cognitive testing and provided false information during his past psychological evaluations in an attempt to manipulate the system to try and obtain more favorable results.

**E.    Evaluation of Respondent by Dr. Logan Graddy**

**1.**    Dr. Logan Graddy is a clinical and forensic psychiatrist who has a great deal of experience appearing as an expert witness in various courts to provide his opinions related to his forensic evaluations.  His Curriculum Vitae is Government Exhibit 7.  His March 3, 2011, forensic evaluation detailing his evaluation of Respondent for civil commitment as a sexually dangerous person is Government Exhibit 6.

**2.**    Dr. Graddy opined that Respondent meets the criteria for civil commitment as a sexually dangerous person, and is at high risk for sexual re-offense.

**3.**    Originally, Respondent hired Dr. Graddy to evaluate him and provide his opinion of Respondent to the Court in hopes that Dr. Graddy would opine that Respondent should not be committed under the Adam Walsh Act.  Petitioner never asked Dr. Graddy to provide an opinion prior to receiving Dr. Graddy's written report from Respondent.  Petitioner decided to use Dr. Graddy as its expert witness only after Petitioner received Dr. Graddy's written report from Respondent.

15

**4.** In forming his opinion, Dr. Graddy conducted a clinical interview of Respondent for four hours on February 1, 2011, at Respondent's request. At the beginning of the interview, Dr. Graddy informed Respondent of his rights, the nature and purpose of the interview, and that the interview was not confidential. Respondent understood the limitations and parameters of the interview and signed a written consent that showed that he voluntarily agreed to proceed.

**5.** Dr. Graddy also reviewed the written discovery provided to Respondent, some of which is presented to the Court as Government Exhibits 8-50. The written discovery includes information related to Respondent's criminal history, social history, substance abuse history, institutional reports, investigative records related to his sexual conduct and psychological evaluations by other mental health care providers. He also considered the presence of strong exacerbating dynamic factors and their impact on Respondent's risk.

**6.** Dr. Graddy determined that Respondent had previously committed or attempted to engage in sexually violent conduct or child molestation.

**7.** Dr. Graddy diagnosed Respondent with the following mental disorders: pedophilia, sexually attracted to females, nonexclusive type; alcohol dependence, in a controlled environment; and antisocial personality disorder and psychopathy.

**8.** In regards to Respondent's psychopathy, Dr. Graddy opined

16

that Respondent is able to function well when incarcerated, and due to his superficial charm and shallow affect, he may even give the impression to those who meet him briefly that he is compliant, cooperative or regretful for his actions. However, Dr. Graddy opined that Respondent has stable, severe symptoms of psychopathy that has not improved and will not improve. The environment of a contained facility is responsible for his current behavior and his behavior is not explained by an improvement in his mental disorder.

**9.** Dr. Graddy also noted that Respondent spoke in great detail about the numerous ways that he had been mistreated in the federal justice system. Respondent often returned to themes of how he had been mistreated or persecuted. When he returned to his previous topic after being interrupted with a question, Respondent would start explaining the subject again from the beginning and would often provide the same information again with a very similar cadence and wording as before.

**10.** Dr. Graddy used the SVR-20 (Sexual Violence Risk-20) assessment tool on Respondent and found that he had the following risk factors for sexual violence: sexual deviation; victim of child abuse; psychopathy; history of suicidal ideation; substance abuse problems; relationship problems; employment problems; past non-sexual violence offenses; past supervision failures; high-density sex offenses; multiple sex offense types; physical harm

to victims; extreme minimization or denial of sex offenses; attitudes that support or condone sex offenses; lacked realistic plans; and negative attitude toward intervention.

**11.** Dr. Graddy's final opinion about the interaction between Respondent's pedophilia with his antisocial personality disorder and psychopathy and how it affects his future risk for sexual violence or child molestation is as follows:

> [Respondent] has a DSM-IV TR diagnosis of pedophilia. Due to this disorder, combined with his diagnoses of antisocial personality disorder, psychopathy, and alcohol dependence, if released unconditionally, to the degree that the past predicts the future, he is highly likely to re-offend. Throughout his life he has been unable to refrain from antisocial acts such that he has spent the vast majority of his life in prison and has not been able to function more than a few months in the community without committing a crime. Furthermore, his behavior shows a disdainful attitude toward supervision.

(<u>See</u> Government Ex. 6, 9.)

**F.    Evaluation of Respondent by Dr. Harry Hoberman**

**1.**    Dr. Harry Hoberman is a forensic psychologist, who has evaluated hundreds of sex offenders for civil commitment in multiple states.  His Curriculum Vitae is Government Exhibit 2.  His January 4, 2011, forensic evaluation detailing his evaluation of Respondent for civil commitment as a sexually dangerous person is Government Exhibit 1.

**2.**    Dr. Hoberman opined that Respondent meets the criteria for civil commitment as a sexually dangerous person, and is at high risk

for sexual reoffense.

3.    In forming his opinion, Dr. Hoberman reviewed the written discovery provided to Respondent, some of which is presented to the Court as Government Exhibits 8-50. Dr. Hoberman did not conduct a clinical interview of Respondent, but did listen to Respondent's testimony at the hearing.    The written discovery includes information related to Respondent's criminal history, social history, substance abuse history, institutional reports, investigative records related to his sexual conduct and psychological evaluations by other mental health care providers.    He also considered Respondent's range of risk on actuarial tools and the presence of strong exacerbating dynamic factors.

4.    Dr. Hoberman determined that Respondent had previously committed or attempted to engage in sexually violent conduct or child molestation.    In support of this conclusion, Dr. Hoberman referred to Respondent's sexually related crimes in 1967, 1989, 1990, and 2003.

5.    Dr. Hoberman diagnosed Respondent with the following mental disorders: Pedophilia; Hebephilia; Alcohol Dependence, in a Controlled Environment;    Anti-Social Personality Disorder; significant traits of Narcissistic Personality Disorder; and psychopathy.

6.    In his report, Dr. Hoberman noted that paraphilias are

defined as the DSM-IV-TR as "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving: 1) non-human objects; 2) the suffering or humiliation of oneself or one's partners, or 3) children or other non-consenting persons that occur over a period of at least 6 months."

**7.** Dr. Hoberman noted that "at this point in time, [Respondent] remains an untreated sex offender; he remains a sex offender in need of substantial and intensive additional general and sex offender specific treatment." (Ex. 1, p. 56, Bates#: BARR 3134.) He further noted that:

> The nature of [Respondent's] sexual offending also demonstrates serious difficulty in control. He has abducted and/or attempted to abduct minor females in relatively public settings such as on the streets or in the common areas of a motel or to persons who know and can identify him. Further, [Respondent] has a broad victim pool encompassing both very young, pre-pubescent, and peri/post pubescent minor females; he is both opportunistic and less discriminating in his sexual offending behavior.

(Id. at p. 66-67, Bates#: BARR 3144-45.)

**8.** Dr. Hoberman scored Respondent on three actuarial instruments to assess his risk of sexual re-offense. All three of these instruments have been subjected to multiple validation studies that have established their usefulness in predicting sexual re-offense.

**9.** Dr. Hoberman used the STATIC-99, the Sex Offender Risk

Appraisal Guide (SORAG), and the Minnesota Sexual Offender Screening Tool-Revised (MnSOST-R), to assess Respondent's likelihood of re-offense. These tools do not give a percentage of the chance that Respondent would reoffend, but rather are used to understand Respondent's relative risk as compared to other sex offenders. Moreover, each tool predicts whether an offender will be charged with a new sex offense. Consequently, each tool underestimates the probability that an offender will commit a new sex offense as it is well known that most sexual offenses go unreported and undetected.

10. Based on Respondent's scores on these three actuarial tools, Dr. Hoberman opined that Respondent would be at a high risk of committing another sex crime in the future.

11. Dr. Hoberman also scored Respondent on the Hare Psychopathy Checklist, revised (PCL-R). Based on Respondent's score on the PCL-R, Dr. Hoberman opined that Respondent has psychopathy. Dr. Hoberman opined that Respondent's psychopathy puts Respondent at a high risk of committing another sex crime in the future.

12. Dr. Hoberman used the Sexual Violence Risk -20 (SVR-20) to evaluate Respondent as a structured professional risk assessment instrument. This instrument provides a list of twenty variables believed to be associated with a higher risk of sex offense recidivism. According to the SVR-20, Dr. Hoberman opined that

Respondent

Has been characterized to some degree by 16 factors: 1) deviant sexual arousal; 2) victim of child abuse; 3) psychopathy; 4) substance use problems; 5) suicidal ideation (possible homicidal ideation); 6) relationship problems; 7) employment problems; 8) past non-sexual violent offenses; 9) past non-violent offenses; 10) past supervision failure; 11) high density offenses; 12) multiple sex offense types; 13) physical harm to victims in sex offenses; 14) use of weapons or death threats in sex offenses; 15) an escalation in frequency or severity of sex offenses; 16) episodic minimization and denial of sex offenses; He does not appear to be characterized by a major mental illness. There is insufficient information to rate three items: evidence of attitudes regarding sexual offending; future plans; and attitude toward intervention. Thus, almost all of the dimensions of this instrument appear to characterize the subject. Overall, the application of this rating scale would indicate that [Respondent] is characterized by a high likelihood of sexual recidivism.

(Id. at p. 82, Bates#: BARR 3160.)

**13.** Dr. Hoberman also used the Structured Risk Assessment-Forensic Version (SRA-FV). The SRA-FV is a conceptually based instrument for assessment of potential long-term vulnerabilities or propensities that may predispose an offender towards future sexual offending. These long-term vulnerabilities are also sometimes referred to as psychological or dynamic risk factors. The constructs reflected within the SRA-FV have been shown to be related to sex offense risk in numerous research efforts and in the creation of other instruments intended to measure these constructs. Respondent received elevated scores on all three

22

domains: Sexual Interests, Relational Style and Self-Management Domain. His total score on the SRA-FV was "5." This falls in the Very High priority category; this level of Need strongly indicates the exceptional levels of risk management are appropriate.

**14.** Dr. Hoberman did not find that Respondent's advanced age, which would usually be a protective factor that could reduce his risk, applied in this case. Nor did Dr. Hoberman conclude that Respondent's paraphilias had remitted with time. Instead, he opined that:

> There is little or no evidence that [Respondent] is no longer characterized by his sexual disorders; paraphilias are generally regarded as lifelong dimensions of sexual arousal patterns. Similarly, there is little or no evidence that [Respondent's] Personality Disorder and Psychopathy are no longer present. Available research would indicate that neither a Personality Disorder nor significant Psychopathy "remit" on their own or necessarily with age. Further, for [Respondent], disorders of deviant sexual arousal exist in conjunction with a Personality Disorder/significant Psychopathy (reflective of by an extreme lack of concern for others and heightened self-centeredness), a particularly dangerous combination relative to both self-control and future sexual offending.

(Id. at p. 67, Bates#: BARR 3145.)

**15.** Dr. Hoberman concluded his report with the following opinion:

> It is my opinion that [Respondent] continues to present a danger to others in terms of future sexual offenses against potential victims (e.g. sexually violent conduct and/or child molestation) if he does not receive intensive, long term general mental health and further specific sex offender treatment. Without additional long-term treatment, [Respondent] is likely to be

23

characterized by much the same psychological needs and dynamics that have existed for at least 48 years and which provided the impetus for his criminal sexual behavior in the past. Further, despite previous sanctions, prior civil commitment as a psychopathic offender, and multiple incarcerations, [Respondent's] level of risk for future sexual offending (e.g. sexually violent conduct and/or child molestation) remains high.

(Id. at p. 86, Bates#: BARR 3164.)

## G. Evaluation of Dr. Lela Demby

**1.** Dr. Lela Demby is a clinical psychologist, and is currently employed as a sex offender forensic psychologist. She is a commissioned officer with U.S. Public Health Service, and is assigned to FCI Butner. She has conducted approximately 1,040 sex offender forensic psychological examinations under the Adam Walsh Act over the past six years. She has done full forensic evaluations of approximately fifty of the Adam Walsh detainees. Her Curriculum Vitae is Government Exhibit 5.

**2.** Dr. Demby's initial § 4248 Forensic Evaluation of Respondent dated August 13, 2007, is Government Exhibit 3. Her updated Forensic Evaluation dated December 21, 2010, is Government Exhibit 4.

**3.** Dr. Demby opined that Respondent meets the criteria for civil commitment as a sexually dangerous person under the Adam Walsh Act, and is at high risk for sexual re-offense.

**4.** In forming her opinion, Dr. Demby reviewed the written

discovery provided to Respondent, some of which is presented to the Court as Government Exhibits 8-50. Dr. Demby did not conduct a clinical interview of Respondent. The written discovery includes information related to Respondent's criminal history, social history, substance abuse history, institutional reports, investigative records related to his sexual conduct, and psychological evaluations by other mental health care providers. She also considered Respondent's range of risk on actuarial tools and the presence of strong exacerbating dynamic factors.

5. Dr. Demby diagnosed Respondent with the following mental disorders: pedophilia, sexually attracted to females, nonexclusive type; alcohol dependence, in a controlled environment; and antisocial personality disorder and psychopathy.

6. Dr. Demby used the STATIC-99R to assess Respondent's risk to reoffend. Dr. Demby scored Respondent as a 3 on the STATIC-99R, which placed him in the Low-Moderate risk category. She noted that offenders with the same score from the preselected high risk and needs sample have been found to sexually reoffend at a rate of 15.8% in five years, and 24.3% in ten years.

7. Dr. Demby also considered other exacerbating factors outside the actuarials, including the PCL-R. Dr. Demby scored Respondent as 30 on the PCL-R. This means that he is within the psychopathic range. Dr. Demby opined that this attribute causes

Respondent's risk for future sexual re-offense to increase.

8. Dr. Demby scored Respondent on the SVR-20. She found that he had thirteen factors on the SVR-20 that were considered to exacerbate his risk, including negative social influences, poor sexual and general self-regulation, substance abuse, poor management of negative mood, past history of failure in substance abuse treatment, general criminality, and history of social maladjustment. She noted the unmistakable theme of sexually aggression and fixation that reoccurs throughout Respondent's criminal history. She opined that Respondent's score on the SVR-20 indicated that he has a high risk of future sexual violence.

9. Dr. Demby also considered Respondent's advanced age because that would usually mitigate his future risk. However, she opined that Respondent defies this typical trend because he continued to engage in sexual offenses through his 40s and into his late 50s. As she put it, Respondent "has a 17-year period of sexual offending past the age of 40 that demonstrates that the four-point reduction in risk level for advanced age [in the Static 99R] is not appropriate in his case, and he remains at increased risk of re-offense." (Ex. 4, p. 26, Bates #: BARR 3077.)

10. In summarizing her risk assessment and prognosis of Respondent, Dr. Demby opined that:

> [Respondent] is a sex offender with five convictions for
> Unlawful Imprisonment (originally Attempted Rape),
> Assault With Intent to Rape (originally two counts),
> Kidnapping, and Violation of Supervised Release involving
> alleged attempted molestation. He has significant
> psychological diagnoses, namely Pedophilia, Sexually
> Attracted to Females, Non-exclusive Type, as well as
> Alcohol Dependence and Antisocial Personality Disorder.
> He has stated that alcohol has played a part in his sexual
> offenses. His sexual deviancy appears to be amplified by
> his personality disorder whose essential features include
> disregard and violation of the rights of others. His
> criminal history is comprised of violent and sexual
> offenses which have continued despite detection and harsh
> legal sanction. Actuarially, his scores indicate a
> low-moderate risk for future sexual re-offense. However,
> he has numerous exacerbating factors that are not
> accounted for by the actuarial measures, and he appears
> to be an exception to the decline in risk due to advanced
> age. In summary, his sexual preoccupation, criminal
> history, offense characteristics, personality patterns,
> and exacerbating factors indicate an elevated risk of
> future sexual re-offense. Thus it is the opinion of this
> psychologist that [Respondent's] risk for re-offense is
> high, and his prognosis at this time is considered poor.

(Id. p. 26-7, Bates #: BARR 3077-78.)

**11.** Dr. Demby's final opinion on the issue of Respondent's

sexual dangerousness was that:

> It is highly likely that [Respondent] will continue to
> sexually offend. His diagnoses of Pedophilia, Sexually
> Attracted to Females, Non-exclusive Type, Alcohol
> Dependence, and Antisocial Personality Disorder are
> chronic, pervasive, and deeply ingrained. He has continued
> to sexually offend against women and girls in spite of the
> sanctions and controls that society has imposed on him so
> far. It is the opinion of this evaluator that [Respondent]
> is a person who continues to suffer from a serious mental
> illness, abnormality, or disorder, as a result of which
> he would have serious difficulty in refraining from
> sexually violent conduct or child molestation if released.

(Id. p. 27, Bates #: BARR 3078.)

## H. Evaluation of Respondent by Dr. Terence Campbell

**1.** Dr. Terence Campbell is a clinical and forensic psychologist. His Curriculum Vitae is Respondent's Exhibit 2. His forensic evaluation of Respondent dated August 2, 2011, is Respondent's Exhibit 2.

**2.** Dr. Campbell reviewed the same documents made available to Dr. Hoberman, Dr. Graddy, and Dr. Demby. He also conducted an interview of Respondent.

**3.** Dr. Campbell concluded that Respondent does not meet the criteria for civil commitment under the Adam Walsh Act as a sexually dangerous person.

**4.** Dr. Campbell did not diagnose Respondent with any personality disorders or paraphilias.

- Dr. Campbell disagreed with Dr. Graddy's (who was the first expert that Respondent chose and voluntarily spoke to in the hopes that Dr. Graddy would opine that he should not be committed) 2011 diagnosis of Respondent with: pedophilia, sexually attracted to females, nonexclusive type; alcohol dependence, in a controlled environment; and antisocial personality disorder and psychopathy.

- Dr. Campbell disagreed with Dr. Hoberman's 2011 diagnosis of Respondent with: Pedophilia; Hebephilia; Alcohol

28

Dependence, in a Controlled Environment; Anti-Social Personality Disorder; significant traits of Narcissistic Personality Disorder; and psychopathy.

- Dr. Campbell disagreed with Dr. Demby's 2007 and 2010 diagnosis of Respondent with: pedophilia, sexually attracted to females, nonexclusive type; alcohol dependence, in a controlled environment; and antisocial personality disorder and psychopathy.

- Dr. Campbell disagreed with Dr. Bourke and Dr. Hernandez' psychosexual evaluation and discharge report from 2001 in which they diagnosed Respondent with: pedophilia, sexually attracted to females, nonexclusive type and antisocial personality disorder (with psychopathic features).

- Dr. Campbell disagreed with Dr. Bourke's pre-certification report from 2007 in which he diagnosed Respondent with: pedophilia, sexually attracted to females, nonexclusive type; alcohol dependence, in a controlled environment; and antisocial personality disorder (with psychopathic features).

- Dr. Campbell disagreed with Dr. Vidal's psychiatric examination from 1968 in which he diagnosed Respondent with: antisocial reaction.

- Dr. Campbell disagreed with Dr. Backer and Dr. Owens' forensic evaluation from 1991 in which they diagnosed Respondent with: alcohol dependence and antisocial personality disorder.

- Essentially, Dr. Campbell disagrees with these eight doctors who have diagnosed Respondent with at least some form of personality disorder or paraphilia for the past forty three years from 1968 until 2011.

5.    Dr. Campbell believes that Respondent cannot be diagnosed with pedophilia because the DSM IV should, but does not, account for remission of pedophilia.

6.    Dr. Campbell cited an article from 2004 –2 years before the Adam Walsh Act was even passed— to claim that for purposes of SVP (which is not the same as the sexually dangerous person standard), a mental disorder requires an impairment in volitional control.   He goes on to opine that Respondent does not have high impulsivity based on Respondent's score on the Barrat Impulsiveness Scale and because Respondent self reported that when he feels organized he is more comfortable.

7.    Dr. Campbell spent several pages discussing why he does not like the PCL-R without analyzing it in relation to Respondent or applying it at all to the facts in this case.

8.    Dr. Campbell critiques the various actuarial tools used

by the other experts in this case from roughly page 35-72 of his report without mentioning Respondent or the relevant facts in this case. His report barely touches on any of the facts and evidence related to Respondent.

**9.** Dr. Campbell basically opines that all of the science used by the other experts is incorrect, but then proceeds to provide his own opinion that there is no evidence indicating that Respondent currently exhibits a serious mental illness, abnormality, or disorder, there is no evidence indicating that Respondent currently exhibits impairment in his volitional capacity, then he uses the Static-99R to say that Respondent has a low risk of recidivism, and applying additional risk factors would lead to an excessive number of false positive classifications.

**CONCLUSIONS OF LAW**

**A. Respondent Has Engaged in or Attempted to Engage in Sexually Violent Conduct or Child Molestation.**

**1.** Petitioner has established by clear and convincing evidence that Respondent has engaged in or attempted to engage in sexually violent conduct or child molestation in the past including his conduct related to the 1963, 1967, 1989, and 1990 convictions and the 2003 supervised release violation.

**B. Respondent Is "Sexually Dangerous" to Others.**

**1.** First, Petitioner has established by clear and convincing

evidence that Respondent suffers from a serious mental illness, abnormality or disorder, to wit pedophilia, anti-social personality disorder, and psychopathy.

**2.** Second, Petitioner has established by clear and convincing evidence that as a result of this serious mental illness, abnormality, or disorder, Respondent would have "serious difficulty in refraining from sexually violent conduct or child molestation if released."

**3.** Petitioner must show that Respondent's difficulty in refraining will be "serious," but it need not establish that Respondent will, or is likely to, reoffend. See United States v. Hunt, 643 F. Supp. 2d 161, 179-81 (D. Mass. 2009). Instead, the analysis focuses on Respondent's volitional control understood in relation to his mental illness. See United States v. Carta, Civil No. 07-12064-PBS, 2011 WL 2680734, *22 (D. Mass. July 7, 2011). This determination requires more than relying on recidivism rates of past offenders, but requires analysis of a range of different factors, including Respondent's history before incarceration, his time in prison, and the opinions of experts. Id.

**4.** A court must consider the constitutional constraints on the civil commitment scheme when making a decision on this prong of the analysis. Carta, 2011 WL 2680734 at *23 ("In Kansas v. Crane, 534 U.S. 411 (2002), the Supreme Court held that in order to civilly

32

commit someone for sexual dangerousness 'there must be proof of serious difficult in controlling behavior.' Id. at 413. The Court noted that this standard allowed courts wide discretion in relying on a number of different factors relevant to sexual dangerousness. The standard did not have 'any kind of narrow or technical meaning;' nor was it demonstrable with 'mathematical precision.'").

5.     In other words, in its analysis of potential future risk, the Court has considered more than just whether Respondent exhibits traits shared by other recidivists. See id. Rather, the Court has considered Respondent's volitional control "in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself. . . [in such a way that] distinguish[es] [him] from the dangerous but typical recidivist convicted in an ordinary criminal case." Id.

6.     Respondent's pedophilia and lack of self-control is exacerbated by his anti-social personality disorder and psychopathic attributes and alcohol addiction. Many of his past behaviors appear to have arisen from a combination of his personality traits and his serious mental illness, abnormality, or disorder. Moreover, Respondent appears to have little to no ability to manage his mental illness.

7.     The evidence in this case, including the testimony of Respondent at trial, supports the Court's conclusion that Respondent

would have "serious difficulty in refraining from sexually violent conduct or child molestation if released."

**8.** Mrs. Hendon and Mr. Riddick's testimony is not relevant and is excluded.

**9.** The Court rejects Dr. Campbell's opinion that Respondent cannot be diagnosed with pedophilia pursuant to Dr. Campbell's unsupported opinion that the DSM IV should recognize that over time a paraphilia goes into remission. Furthermore, Dr. Campbell's opinion spans 80 pages and has little if anything to do with the relevant facts and science as applied to Respondent. As such, the Court cannot reconcile Dr. Campbell's opinion with all the other evidence in this case. Finally, Dr. Campbell essentially opines that science cannot predict whether someone may have serious difficulty in refraining from sexually violent conduct or child molestation if released, but then proceeds to state that, in his opinion, Respondent would not have serious difficulty refraining from such behavior. The Court rejects this opinion by Dr. Campbell because it is internally inconsistent and not credible.

**10.** The Court gives greater weight to the opinions of Dr. Hoberman, Dr. Demby, and Dr. Graddy. Their analysis of Respondent's sexual dangerousness is more thorough, better reasoned, better supported by the record, and better supported by independent research. Therefore, the Court agrees with their more convincing

34

and consistent opinions.

**11.** The Court concludes that Respondent has engaged in sexually violent conduct or child molestation in the past, currently suffers from a serious mental illness, abnormality, or disorder, and will have serious difficulty in refraining from sexually violent conduct or child molestation if released.

**12.** Respondent is committed to the custody of the Attorney General under the Adam Walsh Act until such time as he is no longer a sexually dangerous person.

Respectfully submitted, this 30th day of November, 2011.

THOMAS G. WALKER
United States Attorney


BY: /s/ W. ELLIS BOYLE
W. ELLIS BOYLE
Attorney for Petitioner
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919)856-4821
Email: ellis.boyle@usdoj.gov
N.C. Bar #: 33826

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that a copy of the foregoing has been served upon Lewis A. Thompson, III, counsel for Respondent, by electronically filing the foregoing with the Clerk of Court this date, November 30, 2011, using the CM/ECF system which will send notification of such filing to the above.


BY: /s/ W. ELLIS BOYLE
W. ELLIS BOYLE
Attorney for Petitioner
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919)856-4821
Email: ellis.boyle@usdoj.gov
N.C. Bar #: 33826